# Staunton

**KATE WALKER AMES, ET ALS. V. AMERICAN NATIONAL BANK OF PORTSMOUTH.**

September 20, 1934.

Present, Holt, Epes, Hudgins, Gregory and Chinn, JJ.

2

6

The opinion states the case.

*James E. Heath* and *William G. Maupin,* for the appellants.

*Vincent L. Parker* and *Tazewell Taylor,* for the appellee.

EPES, J., delivered the opinion of the court.

Approximately the first third of this opinion is taken up with a statement of the case and excerpts from the opinion of the chancellor stating his reasons for sustaining the demurrer and dismissing the bill. Following that will be found our reasons for reversing the decree and overruling the demurrer.

At first February rules, 1933, Kate Walker Ames and a large number of other persons, all who are stockholders of the First National Bank of Portsmouth (who sue for themselves and all other stockholders of the bank who shall come in), filed their bill against the American National Bank of Portsmouth. Nine other persons filed petitions praying to be admitted as parties complainant in the suit, and stand on the same footing as the original complainants.

The case was submitted on the bill (and the exhibit filed therewith) and the demurrer of the defendant. On July 13, 1933, the court sustained the demurrer.

Thereupon the complainants tendered and asked leave to file an amended bill which the court, by its decree of July 13, 1933, refused to permit to be filed, stating in the decree that it did so for the same reasons given in its opinion for sustaining the demurrer to the original bill. The cause stands here in practically the same situation as if the amended bill had been filed and a demurrer thereto interposed and sustained; and we shall so consider the case. Omitting one ground which has no application to the amended bill, we shall treat the demurrer to the original bill as being filed as a demurrer to the amended bill. When we hereafter use the word bill, amended bill will be understood.

With some immaterial omissions and some slight changes in language made by us to shorten it somewhat, the bill reads:

"1. On the 15th of July, 1929, they [the complainants] were stockholders of the First National Bank of Portsmouth, Virginia, a national banking association in the city of Portsmouth, Virginia, and have remained such to the present time. This bank ceased to do business on the 15th of July, 1929, and a receiver for it was appointed by the acting Comptroller of the Currency on the 24th of October, 1932. Since that time its directors have wholly given up and abandoned its management, and, although specifically requested so to do prior to the institution of this suit, have refused to institute, in the name of the bank, a suit to accomplish the objects for which this suit has been brought, and the said receiver, although similarly requested, has likewise refused.

"2. Prior to the 9th of July, 1929, the State Bank of Portsmouth was also doing banking business in Portsmouth, and on the 9th of July, 1929, it was closed by order of the State Banking Commissioner of Virginia, and shortly thereafter it became generally known that its cashier had embezzled a large amount of money therefrom and that it was hopelessly insolvent. * * * Because of the excitement and unrest caused by the closing of the State Bank numbers of the depositors of the First National Bank withdrew their deposits from it, though it was entirely solvent and able to meet its obligations in the ordinary course of business, but was unable to withstand a sustained run. Accordingly, on the 12th of July, 1929, a meeting of the Board of Directors of the First National Bank was called and held, at which the executive vice-president and the cashier of the American National Bank of Portsmouth, a national banking association doing business in Portsmouth, were invited to be and were present. At said meeting the following resolution was unanimously adopted:

" 'Resolved, that it is the belief of this board of directors that an emergency of such grave proportions exists that it is necessary to take any action for the protection of the depositors that may be required by such banking institution as will agree to accept a sufficient amount of its assets to guarantee all liabilities of every nature except the stockholders' liability.'

"Thereupon the executive vice-president and cashier of the American National Bank of Portsmouth assured the directors of the First National Bank that the American National would make an examination of the assets and liabilities of the First National, beginning the next day, June 13, and would advise the directors of the First National whether the American National would purchase the assets of the First National and assume its liabilities, except to stockholders.

"3. On the 15th of July, 1929, a meeting of the board of directors of the First National was duly called and held, at which meeting a contract between said First National and American National, which contract had been prepared at the direction of American National Bank and approved by its board of directors, was submitted for the approval of the board of the First National Bank, and the following action was unanimously taken, as disclosed by the minutes of said meeting:

" 'Contract with the American National Bank selling to it the assets of this bank and the assumption by it of this bank's liabilities, except to stockholders, was read, ratified and approved in a motion put and carried by a unanimous vote.'

"The said contract had already been presented to the Board of Directors of the American National for approval and had been approved and authorized by language substantially identical with the language of the resolution of the Board of Directors of the First National. The Board of Directors of the American National thereby specifically authorized the purchase by the American National of the

assets of the First National and the assumption of all the liabilities of said First National except to its stockholders, by the American National. The contract was thereupon executed by the First National Bank of Portsmouth and by the American National Bank of Portsmouth by the appropriate officers respectively of both banks, and was signed and acknowledged by the directors of both banks. A true copy of said contract is herewith filed, marked exhibit 'A,' as a part of this bill.

"The true intent and meaning of this contract, as disclosed by its terms, and as construed by the First National Bank and by the American National Bank, was a purchase by the American National of all of the assets of every nature and description of the First National and the assumption by the American National of all of the liabilities of the First National except its liabilities to its stockholders. This interpretation of said contract is evidenced by both of said banks as follows, to-wit:

"On the 15th of July, 1929, the same day said contract was executed, the American National inserted in the public press an advertisement in the following words and figures, to-wit:

" 'AMERICAN NATIONAL BANK
Effective today, has purchased the assets
of and assumed all liability
to the Depositors of the
FIRST NATIONAL BANK
We Pride Our Success On The
SERVICE
We have rendered our customers, and
we promise this same courteous and
efficient service to every patron of the
First National Bank.
AMERICAN NATIONAL BANK
Portsmouth's Largest Bank
Not Too Large For the Smallest Customer
Resources Over $6,000,000.00.'

"On the 19th of July, 1929, the Board of Directors of the First National mailed to each of its stockholders a letter, which letter had been authorized and approved by said board in meeting assembled, which contained the following language:

" 'Your Board of Directors has sold to the American National Bank of Portsmouth, Va., all of the assets of your bank, and the American National Bank of Portsmouth, Va., has assumed all of the liabilities except to stockholders of your bank.'

"On the 25th of July, 1929, the American National, through its president, vice-president and cashier, acting under authority of its Board of Directors, wrote and mailed to each stockholder of the First National a letter containing this language:

" 'This is to confirm our purchase of all the assets of the First National Bank and the assumption of all of the liabilities except to stockholders.'

"On the 24th of January, 1930, the action of the Board of Directors of the First National Bank in selling to the American National its assets in consideration of the assumption of its liabilities by the American National was duly ratified by the stockholders of the First National Bank in meeting assembled.

"4. Pursuant to this contract the First National Bank immediately conveyed, assigned, turned over and delivered to the American National Bank as and for its own property all of the assets, real and personal, of every kind and description of the First National, and went out of active business; and the American National Bank, pursuant thereto, accepted said assets as and for its own property, and immediately thereafter, by public advertisement, notified each and every depositor of the First National that it had assumed all the liabilities of the latter and would pay on presentation any and all checks drawn by them against their respective balances, whether said checks should be drawn upon the First National or upon the American National

Bank. In addition, it at once took possession of all of the business of the First National Bank, removed all its books and documents to its own banking house, and in every possible way conducted itself as the purchaser of and successor to all the latter's assets, business and affairs. It proceeded at once to pay off all its depositors, as their checks were presented to it, and to liquidate its other indebtedness. It also proceeded as it saw fit to collect what was due the First National and generally to convert its assets into cash. All these funds it treated as absolutely its own, neither earmarking the same, nor in any way identifying them, but causing the same to be paid into its general treasury and mingled indiscriminately with its own funds. The face value of said assets so purchased by the American National was very considerably in excess of said liabilities assumed by it, to the extent of approximately $500,000.

"5. As will appear from an inspection of exhibit 'A,' it was expressly agreed that the American National Bank should forthwith classify the assets so purchased by it into two classes, collectible assets and doubtful assets, and thereby ascertain the difference in value, if any, between the collectible assets of the First National Bank and its liabilities. No part of this obligation and duty was imposed upon the First National, but the performance thereof was, at the request of the American National and in its interest, left entirely to the latter bank. The contract imposed upon said First National Bank the obligation to sell, transfer and deliver to the American National all of its assets of every kind, and this obligation the First National duly discharged by the immediate transfer and delivery of all its assets to said American National. The only other obligation imposed by said contract upon the First National was to execute and deliver to the American National its note for the difference, if any, between the sum total of the liabilities assumed under the contract by the American National and the sum total of the collectible assets as ascertained by said classification thereof. * * *

"6. On or before July 25, 1929, the American National Bank did make a classification of the assets of the First National, and thereby ascertained, and on July 25, 1929, formally notified the stockholders of the First National that the First National Bank was solvent, and that its collectible assets were equal to, if not greater than liabilities. And on a number of occasions subsequently, the American National Bank assured your complainants, and other stockholders of the First National, that a considerable surplus would be left from the collection of the assets of the First National after the payment of its liabilities, which surplus would be available for distribution among the stockholders of the First National; and upon such formal notification and assurance your complainants implicity relied. Your complainants are informed and charge that the American National Bank has not at any time made any classification of the assets of the First National which disclosed that the total amount of the collectible assets was for a lesser amount than the liabilities of said First National assumed by the American National. Your complainants further allege that the contract is a contract of purchase and sale, and that no liability whatever was imposed thereby upon the First National Bank unless and until such a classification of its assets should be made by the American National Bank; in the event of such classification the liability of said First National Bank was one of indemnity only and was strictly limited to the difference, if any, between the total of the liabilities assumed by the American National and the total of the collectible assets as determined by said classification. The contract imposed the obligation upon the American National Bank to make such a classification of assets, and thereby to determine the difference, if any, between the liabilities assumed and the collectible assets, before it was entitled to any indemnity from the First National, and the amount of said indemnity, if any, could be ascertained only by means of said classification; unless such a classification should be made and should disclose a deficiency between the total of the liabilities as-

sumed and the total of the assets classified as collectible, no liability whatever was imposed upon said First National.

"7. Notwithstanding the premises, the defendant, on the 15th of July, 1929, immediately after said contract had been executed, but before any classification of the assets of the First National had been made by the American National, procured from certain officials of the First National a note, signed in its name, for the sum of approximately $2,202,-000. This amount was the difference between the total liabilities of the First National and its cash on hand plus cash then due it by other banks. It was not the difference, and did not purport to be the difference, between the liabilities and the collectible assets. The execution of said note was a departure from and a violation of the terms of said contract, was never authorized or ratified by the directors of the First National Bank and was never authorized or ratified by its stockholders. The said note was without consideration, and the execution thereof was without authority in the officials who executed the same in the name of the bank, and the said note is not and never has been a valid obligation binding upon the First National Bank, but on the contrary is an *ultra vires* act of the officers of the bank without legal effect to fasten any liability whatever upon the bank.

"8. The defendant proceeded to discharge the liabilities and to dispose of the assets formerly belonging to the First National Bank. Your complainants are now informed that, as it disposed of said assets, it would credit the amounts received therefor on the above mentioned note. They are also informed that, by this process, said note had been, on October 7, 1932, reduced to the sum of $472,126.16, and that, thereupon, the defendant purported to sell all the remaining assets formerly belonging to the First National Bank, which had not theretofore been converted into cash, the face value of which at the time was $546,823.79, for the sum of $172,000. At this purported sale the American National Bank was the sole bidder for said assets, and the above mentioned sum of $172,000 was the only offer made there-

for. That is to say, the American National Bank purported to sell to itself, and to purchase from itself, said assets, of the face value of $546,823.79, for $172,000. After crediting this sum of $172,000 on said note, there was left a balance thereon of $300,126.16.

"9. Solely to enforce the payment of this balance, the American National Bank subsequently requested the Comptroller of the Currency to make an assessment of all the stockholders of the First National Bank for the full amount of the stock held by each of them. In compliance with the above request, and without notice or opportunity to appear or be heard to the First National Bank or any of its stockholders, the Comptroller of the Currency made this assessment, and all of said stockholders, your complainants included among them, have either been sued, or are threatened with suit, by the receiver, in order to collect from them the amount of their statutory liability for the purpose of liquidating the above mentioned balance. By the aforesaid contract, the American National Bank, in consideration of the transfer and delivery to it of all of the assets of the First National Bank, assumed the payment of all of the liabilities of said First National Bank. * * * The American National Bank claims to have paid all of the liabilities of the First National Bank. If there are any liabilities of the First National Bank still unpaid it is the duty of the American National Bank to pay the same. Your complainants are advised that no claims against the First National Bank other than said note, have been presented to the Comptroller of the Currency, and that no other claims of any kind have been asserted against said bank, but on the contrary that the said balance of $300,126.16, claimed by the American National Bank, is the sole alleged outstanding obligation of said First National Bank."

10. (Is merely argument or repetition, and is omitted.)

"11. Your complainants allege and charge, for the above reasons, that this note is not, and never has been, a valid obligation of the First National Bank, that the officers of

the First National Bank who executed the note were without authority to execute it or deliver it to the American National Bank, and that it would not only be in violation of said contract, but in the highest degree inequitable, that your complainants should be compelled to pay the same or any part thereof. As the said note should never have been given, it should now be cancelled.

"12. Your complainants are advised that the invalidity of said note is not a matter which can properly be raised or adjudicated in the actions which have been brought or may be brought by the receiver of said First National Bank against them seeking to collect from each of them the par value of the stock respectively owned by them in the First National Bank. * * *

"13. Your complainants further show that the said contract between the First National and the American National, dated July 15, 1929, exhibit 'A,' shows that as a part of the consideration for the transfer and delivery of the assets of said First National Bank to the American National Bank the American National agreed to use all reasonable care and diligence in converting the said assets into cash and, after repaying to itself from the proceeds of such conversion the amount of the liability assumed by it in said contract, together with the costs of collection, it agreed to pay over the balance of money so realized to the stockholders of said First National Bank according to their respective rights and interests. Your complainants allege that it became and was the duty of the American National Bank to use due diligence in converting said assets into cash and to act in the premises in good faith in a *bona fide* effort to realize from the said assets their true value, not only for its own protection but for the benefit of the stockholders of said First National. Among the assets which were transferred and delivered to the American National Bank on the 15th of July, 1929, there were listed bonds and securities which had a market valuation as of that date of approximately $285,000, and for which there was a ready sale through any bond or broker-

age concern at their quoted valuations, and your complainants aver that at the time the said assets were transferred to the American National Bank, the general condition of the security market was good and the said bonds and other securities were selling at good prices, and it was the duty of the American National Bank to convert the said bonds and securities into cash in pursuance of its obligation under the contract aforesaid. But the American National Bank did not make sale of the said bonds and securities in accordance with its plain duty, but held the same until the said bonds and securities had greatly depreciated in value, and after such depreciation it purported to sell to itself a large number of said bonds and securities at said depreciated value and thereby worked great hardship and injustice upon the stockholders of the First National. Your complainants are informed and aver that even now the said bonds and securities so purchased as aforesaid by the said American National Bank are quoted and readily salable at prices considerably in excess of the price at which the American National so purchased the same.

"14. Your complainants further aver that the American National Bank had no lawful right to make [sale] to itself of assets of the face value of $546,823.79, as set out in paragraph 8 above, and had no lawful right to sell to itself the bonds and securities as set out in paragraph 13 above, because although it was the owner of all of the said assets and of all of the said bonds and securities which it pretended to sell to itself, it, nevertheless, owed the duty to the First National Bank to convert the same into cash for the purpose of repaying to itself the amount of liability which it had assumed under said contract, and paying to the stockholders of said First National Bank, according to their respective rights and interest, any surplus remaining in its hands after such payment; and under such circumstances, the American National Bank had no right to act both as buyer and seller without the consent of the First National

Bank and its stockholders, which consent was never given, and the said sales are hereby expressly repudiated.

"Wherefore, your complainants pray that the American National Bank of Portsmouth, Virginia, and the First National Bank of Portsmouth, Virginia, may be made defendants to this bill (and), required to answer this bill, but not under oath; * * * that this court will construe the contract of July 15, 1929, and decree that, by its express terms, no liability did arise, or could arise, from the First National Bank to the American National Bank unless and until the classification of the assets of the former had been made as therein provided, disclosing a deficiency between the total of the liabilities assumed under said contract and the total of collectible assets as ascertained by said classification; and that inasmuch as no classification disclosing any such deficiency was ever made, there was and is no liability upon the First National Bank growing out of said contract and that accordingly the said note of approximately $2,200,000 was given without authority and without consideration and was and is a nullity, and should be cancelled; that the court will also decree that any and all sales of the assets purchased from the First National Bank made by the American National Bank to itself were improper and invalid and should be set aside; that it will require the said American National Bank to render before one of its commissioners in chancery a strict account of its disposition of the assets of the First National Bank; that, if it should decree the cancellation of said note as herein prayed, it will enjoin the American National Bank from appropriating to its own use any sum or sums which may be collected from any of your complainants and paid over to it by the receiver of the First National Bank, or by the Comptroller of the Currency, but will direct that such sums be held in trust by said bank for the benefit of your complainants and the other stockholders of the First National Bank who may come into and be made parties to this suit; that it will in any event enjoin the American National Bank from disposing of any such sums until such

accounting can be had and until the further order of this court; that all other proper orders and references may be made; and that your complainants may have all such further and general relief in the premises as may be proper or to equity may seem meet."

Exhibit A, filed with the bill, reads:

"This agreement, made and entered into this 15th day of July, in the year 1929, between the First National Bank of Portsmouth, a national banking institution, organized under the laws of the United States, party of the first part, and the American National Bank of Portsmouth, Virginia, a national banking institution, organized under the laws of the United States, party of the second part:

"Whereas, The party of the first part finds that it is impossible for it to continue business and

"Whereas, the party of the second part deems that it would be very disastrous to allow the party of the first part to be closed; and

"Whereas, both parties to this agreement believe that the best interests of the depositors of the party of the first part will be best served by the making of this agreement,

"Now, therefore, in consideration of the premises and for the purpose of preventing the closing of the bank of the party of the first part and in order to save the depositors of the said party of the first part and of the mutual obligations and promises herein made, the party of the first part doth hereby sell, transfer, assign, deliver and set over unto the party of the second part all of its property, whether real, personal or mixed, including the building at present occupied by it as its banking house, and furniture and fixtures therein, and more particularly all the notes, bills, bonds, stocks and other evidences of debt whether now in the possession of the party of the first part or pledged by it for its obligations, a list of said property being attached hereto as a part of this agreement; and the said party of the first part, through its board of directors, hereby authorizes and directs its officers to turn over and deliver

unto the party of the second part all of the notes, accounts, bills receivable, and all items that have been charged off, and all property of every kind and description now in the possession of the party of the first part, and further authorizes the said party of the second part to collect all of the moneys due upon the assets of the said party of the first part and apply the proceeds of such collections to the payment of the obligations of the said party of the first part, upon complete liquidation and full payment to the said party of the second part of all liability assumed under this agreement, together with the costs of liquidation, including all costs incident thereto, and all attorney's fees, paid or assumed in the liquidation, the balance, if any, shall be prorated among the stockholders of the party of the first part according to their respective rights and interests.

"In consideration of the foregoing the party of the second part hereby agrees to take over and receive the property hereinabove conveyed and to use all reasonable care and diligence in realizing upon the said assets and in making sale of said properties and in using the moneys realized therefrom for the payment of the said obligations of the party of the first part, to-wit: All notes, bills payable, and obligations of the party of the first part to its depositors, but excepting any obligations to its stockholders, but nothing in this agreement shall be construed as relieving the stockholders of their individual double obligations as provided by the United States Revised Statutes.

"The said party of the first part agrees to execute and deliver to the said party of the second part a good and sufficient deed to all real estate which it now owns and also all proper assignments, conveyances, bills of sale, assurances, and all other instruments and documents which may at any time and from time to time be necessary or desirable to transfer title of said property to and effectually vest the same in the said party of the second part.

"This sale by the party of the first part and this purchase by the said party of the second part, for the purposes here-

inabove expressed, is made as of the close of business on the 13th day of July, 1929.

"The said party of the first part, together with its officers and directors, hereby agree to render any assistance within its or their power to the said party of the second part in the collection of the obligations herein sold.

"It is further agreed that the said party of the second part shall classify the assets in two classes, *placing in the first class those assets it deems collectible,* and in the other class those assets of doubtful value, and that the First National Bank will execute a demand note payable to the American National Bank for an amount equal to the difference between the assets placed in the first class and the amount of the total of the liabilities assumed; such note to be collateral by all assets placed in the second class and the party of the second part shall have the right at all times to *exchange* any assets placed in the first class *for* any placed in the second class and *vice versa.* (Italics ours.)

"The properties above described and intended to be conveyed by this deed consist chiefly of notes, bonds, stocks and other evidences of debt now chiefly located in the banking building of the party of the first part located in the city of Portsmouth, State of Virginia, together with such other notes, stocks, bonds and other evidences of indebtedness as may be in transit or may have been hypothecated for loans by the party of the first part; it is the intention, however, to convey all the property of the party of the first part, whether the same be specifically mentioned or not.

"It is mutually understood and agreed by and between the parties hereto that the party of the second part shall be entitled to pay out of the said assets and property of the party of the first part any and all expenses and attorney's fees and all costs of any kind and description which it may incur in having this deed prepared and in taking over and handling the assets and property conveyed herein.

"In witness whereof the parties hereto have caused these presents to be signed by their respective executive officers

and their respective corporate seals to be hereto affixed, the day, month and year first above written."

In stating the grounds of demurrer, we shall omit one ground which has no application to the amended bill, consolidate several others, and rearrange the order in which they are stated to coordinate them into two main groups. One group (1-5) is composed of those which do not involve the construction or application of the provisions of the National Bank Act. The other (6-12) is composed of those which involve the construction and/or application of the provisions of the National Bank Act. So stated and arranged, the grounds of demurrer are as follows:

(1) The bill does not state a case which entitles the complainants to any equitable relief.

(2) The bill does not show that the complainants have been injured by the giving of the note for approximately $2,200,000 by the First National to the American National Bank. Had the note been given for a lesser amount, the balance due on the note would now be the same because all amounts collected were properly credited thereon, and had the note been for a lesser amount, the credits would also have been less by the same amount. Under the contract between the banks, the American National had the right at all times to exchange any assets placed in the collectible class for any placed in the doubtful class, and *vice versa;* and the balance now due on the note is the same as it would have been had none of the assets been classified as collectible at the time the note was given.

(3) The contract between the banks and the note executed by the First National Bank were both executed with the approval of the board of directors of the First National, and the action of the board was ratified by the stockholders of the First National Bank, and neither the contract nor the note can "now be nullified by any action of the individual shareholders." The bill further shows that the method followed by the American National Bank in performing its obligations under the contract "was, with knowledge of the

directors and shareholders of the First National Bank, fully ratified, confirmed and approved."

(4) The contract between the banks "is one in which the assets of the First National are pledged as security." The bill shows that the American National has fully performed its obligations to pay and discharge the liabilities of the First National to its depositors and other creditors, and that it has not been fully indemnified for so doing. Until it has been fully indemnified neither the First National, its shareholders, nor any other person is entitled to require it to relinquish any property or assets coming into its hands under the provisions of this contract, or to change the relations of the parties with reference thereto.

(5) The bill shows that from the date of this contract to the institution of this suit the complainants knew or ought to have known, that the American National, "in reliance on that contract, was discharging said obligations, during all of which time said complainants * * * remained silent, and permitted this defendant to discharge said obligations in reliance on said contract, and when this suit was instituted more than three years had elapsed, during all which time said defendant had been engaged in paying and discharging the obligations of the First National Bank in reliance upon its reimbursement under the terms of said contract. The complainants have, therefore, been guilty of grossest laches and are estopped from asserting any right to the relief prayed by them."[1]

(6) The complainants, being neither makers nor endorsers of the note which they ask to have cancelled, have no interest therein, and are, therefore, not entitled to the relief prayed.

(7) As the American National has not been fully indemnified, it would be necessary for the shareholders of the

[1] We shall not notice this ground of demurrer further than to say that the allegations of the bill do not show that either the First National Bank or its stockholders have been guilty of laches which will bar the relief prayed, if the complainants would be otherwise entitled to it.

First National to have paid the assessment made against them by the Comptroller of the Currency for that purpose, before they could be entitled to any of the relief prayed by them, even if "they were otherwise entitled thereto."

(8) The rights of the shareholders of the First National Bank are merged in and transferred to the receiver appointed for it and the shareholders are not entitled to sue to enforce any rights now or previously vested in "The First National Bank or in them as shareholders of the same."

(9) The complainants have a complete and adequate remedy at law by setting up as defenses to the common law actions brought against them by the receiver the matters alleged in the bill.

(10) "It appearing from the bill of complaint that a receiver has been appointed for the First National Bank of Portsmouth and that the Comptroller of the Currency has made an assessment of 100% upon all of its shareholders, his decision is not subject to collateral attack nor is his assessment against the shareholders and the amount thereof open to review and it is therefore not permissible in this proceeding to review said decision, either as to the solvency of said bank, *the sum due creditors* or the amount of assessments as ordered, the effort so to do being contrary to U. S. Code, Title 12, sections 191, 192, 193 and 194 [12 U. S. C. A. sections 191-194]."[2] (Italics ours.)

(11) The receiver of the First National Bank is an officer of the United States, residing in the District of Columbia. His duties are to collect by suit or otherwise the individual statutory liability of the shareholders of that bank

---

[2] This statement of the 10th ground of demurrer is a statement of it as it was revamped by counsel for appellee in his brief. In the original demurrer the pleader includes in this ground these statements: The comptroller's "decision is not subject to attack" (the word *collateral* being omitted), and "neither the First National Bank nor the shareholders are entitled to a review of said comptroller's decision either as to the solvency of said bank, the sum due creditors or the amount of assessments as ordered, all such matters being within the judgment and discretion of said comptroller, *and as to which he acts in a judicial capacity.*" (Italics ours.)

for the purpose of paying its creditors. In case any money is received by the American National as a creditor of the First National from the receiver, both it and this court "will be without means of knowing or discovering who paid the same, in what amounts, and the proportionate part thereof necessary for expenses."

(12) The prayer of the complainants that the money received or which may be received from the receiver or the comptroller be held in trust for them and the other stockholders of the First National Bank, cannot be sustained, because the complainants do not allege that they, or any of them, are creditors of the First National Bank, or have contributed anything to this fund, and it, therefore, fails to show that they have any interest therein.

The chancellor handed down a written opinion, which is made a part of the record, in which, upon a construction of the contract (exhibit A), he holds that the first ground of demurrer is good. With reference to the construction of the contract the court says:

"I do not regard the contract as one of purchase and sale, imposing no liability upon the First National Bank unless and until a classification of its assets was made by the American National Bank. The contract, by whatever name it may be called, is simply an agreement by the American National Bank to receive and reduce to cash certain property of the First National Bank and with the moneys so derived pay the depositors of said First National Bank, and return the surplus, if any, to said First National Bank or its shareholders. In such case if there was a deficiency the First National Bank is still liable. Moreover, the alleged 'obligation upon the American National Bank to make such a classification of assets, and thereby to determine the difference, if any, between the liabilities assumed and the collectible assets' is impracticable, if not impossible, of performance, for the right granted to the American National Bank to shift the collectible and uncollectible assets at all times from one class to the other would render it impossible

to fix upon any definite sum as a measure of liability. * * * I conclude, therefore, * * * that the making of such classification is not a condition precedent to the right of the American National Bank to an indemnity from the First National Bank on account of an unpaid balance representing the difference between the amount paid by the American National Bank to the depositors of the First National Bank and the yield from its assets. It is to be noted, too, that the contract provides no method for carrying out the provision with reference to the classification of assets in order to determine the difference between liabilities and collectible assets. It is not provided that there should be any concert of action between the two banks looking to this end, nor that the question should be submitted to valuers or appraisers and an award made by them.

"It may be said also that the notice, given by the American National Bank to the stockholders of the First National Bank on or before the 25th day of July, 1929, that the collectible assets of the First National Bank were equal to its liabilities, is regrettable, if its effect was to induce in the minds of the stockholders the belief that they would not be called upon by the Comptroller of the Currency for an assessment upon their capital stock. The said notice, coming within ten days after the First National Bank had discontinued business, might well have been construed as an opinion only—in either event, the fact furnishes no legal ground for relief."

As to the authority of the officers of the First National Bank to execute the $2,202,000 note, and the question raised by the bill with reference to the American National's handling of the assets transferred to it by the First National, the court says:

"I consider the execution of the note a valid exercise of authority by the officers of the First National Bank; but, if the act was irregular in the first instance, the irregularity was cured by the action of the stockholders on the 24th day

of January, 1930, in meeting assembled, at which time the said contract was ratified and confirmed.[3]

"It is also charged by the complainants that it was the duty of the American National Bank to use due diligence in converting said assets into cash, and to act in the premises in good faith in a *bona fide* effort to realize from the said assets their true value. This is true and the contract so provides, but there is no allegation in the bill that this duty has not been discharged. The bare statement that bonds and securities having a market valuation of $285,000 were assigned to the defendant, and held until they had greatly depreciated in value, and that after such depreciation a large number were sold by the defendant to itself, does not specifically impute wrong doing to the defendant. All that is said may be true—indeed, it is admitted by demurrer— and still be consistent with the exercise of the utmost diligence and good faith on the part of the defendant. There is no charge of *mala fides* in the bill, and the fact that the defendant was both buyer and seller of some of the assets does not make the sale unlawful. * * *

"In the fourteenth paragraph of the bill they allege that the American National Bank had no lawful right to sell to itself the said remaining assets of $546,823.79. To this charge what has heretofore been said with reference to the alleged sale by the defendant to itself of certain bonds and securities applies with like effect. I do not consider the said sale invalid as a matter of law, and in neither paragraph is there any allegation of bad faith, or that the sale was not legally conducted, or that the sum bid was not a fair one and the best obtainable under the circumstances."

The court rests its decree on the grounds above mentioned; but in conclusion it says it is also of the opinion that

---

[3] As we read the bill it does not allege that the execution of this note was either known to or ratified by either the directors or the stockholders. On the contrary, the bill alleges that the execution of this note "was never authorized or ratified by the directors of the First National Bank and was never authorized or ratified by its stockholders."

the bill cannot be sustained because "the main purpose of the suit, as reflected by the complaints set out in the bill, is to relieve the complainants of their statutory liability as stockholders, and * * * is in effect a collateral attack upon the right of the comptroller to call the assessment and direct its enforcement." It also expresses the opinion that the complainants have an adequate remedy at law, saying, "the invalidity of said note can be raised as a matter of defense by any stockholder who contends that, as a stockholder, he does not owe said note [the $2,202,000 note] and that said note is not an obligation of the First National Bank." In support of this view it cites 7 C. J. 778, section 125, and *Moss* v. *Whitzel* (C. C.) 108 Fed. 579, 581, as follows: "The Supreme Court has not held that a stockholder, when sued by the receiver, is precluded from defending on the ground that he is not a stockholder, or that he owes nothing as such stockholder, or that there is in fact no debt or obligation of the bank existing at the time of the suit against the stockholder."

As we understand the opinion of the chancellor he holds that, even if none of the grounds of demurrer above stated under numbers 6-12 be good, the appellants have not stated a case which entitles either them or the First National Bank to have the note for approximately $2,202,000 cancelled, or the sale set aside which was made to itself by the American National of a part of the assets held by it as collateral, or an accounting to determine what, if anything, is owing by the First National to the American National. It is upon this holding that he primarily rests the decree sustaining the demurrer. We are of opinion that the chancellor is in error in this ruling.

The correctness or incorrectness of this ruling turns primarily upon the construction and interpretation of the contract,[4] and the facts alleged in the bill; and in considering

[4] The appellants and appellee cite us to the following cases bearing on the construction and/or effect of contracts which are somewhat similar to this: *Hightower* v. *American Nat. Bank*, 263 U. S. 351,

it there are certain primary principles which must be borne in mind.

A demurrer admits that all material facts which are well pleaded are true. Facts well pleaded, and therefore admitted, are (1) facts expressly alleged, (2) facts which are by fair intendment impliedly alleged, and (3) facts which may be fairly and justly inferred from the facts alleged.[5] Facts sufficiently alleged must be taken as true (unless they are inherently impossible, or contradicted by other facts pleaded) even though the court may be of opinion that it is improbable that they are true.[6] And all reasonable inferences of fact which a trier of facts may fairly and

68 L. Ed. 334, 44 S. Ct. 123; *Wyman* v. *Wallace*, 201 U. S. 231, 50 L. Ed. 738, 26 S. Ct. 495; *Scott* v. *Norton Hdw. Co.* (C. C. A.), 54 Fed. (2d) 1047, 1049; *Wannamaker* v. *Edisto Nat. Bank* (C. C. A.), 62 Fed. (2d) 696; *Schofield* v. *Nat. Bank* (C. C. A.), 97 Fed. 282; *Liberty Nat. Bank* v. *McIntosh* (C. C. A.), 16 Fed. (2d) 906; *First Nat. Bank* v. *Harris* (C. C. A.), 27 Fed. (2d) 117; *Bassett* v. *City Bank & Tr. Co.*, 115 Conn. 1, 160 Atl. 60; *Id.*, 116 Conn. 617, 165 Atl. 557, 81 A. L. R. 1488; *Sturdivant Bank* v. *Houck* (Mo. App.), 47 S. W. (2d) 135; *First Nat. Bank* v. *Smith*, 85 W. Va. 624, 103 S. E. 318; *Wegman* v. *National Bank* (D. C.), 51 Fed. (2d) 288; *Derscheid* v. *Andrew* (C. C. A.), 34 Fed. (2d) 884. As giving a background for the construction and interpretation of this contract they are helpful. Further than this they are not of great assistance.

[5] Most of the Virginia cases go no further than to say that a demurrer admits as true all averments of material facts which are sufficiently or well pleaded, and that it does not admit the pleader's conclusions of law. For collection of the Virginia cases on the subject see 3 Michie's Va. and W. Va. Dig. section 17, p. 603; also Burks' Pl. & Pr. (2d Ed.) section 196, and Hogg's Eq. Pro. (Carlin's Ed.) section 317. But the text of this paragraph expresses the holding of the Virginia cases as we comprehend them, and it is supported by a great weight of authority from other jurisdictions. See 49 C. J., p. 436, section 544, and cases cited in note 68; cases collected in Dec. Dig., Pleading, section 214 (1) and section 214 (4); *Browning* v. *Browning*, 85 W. Va. 46, 100 S. E. 860; *Clark* v. *West*, 193 N. Y. 349, 86 N. E. 1; *Lamb* v. *S. Cheney & Son*, 227 N. Y. 418, 125 N. E. 817, affirming 181 App. Div. 960, 168 N. Y. S. 1115; *Paggi* v. *Rose Mfg. Co.* (Tex. Civ. App.) 259 S. W. 962; *Berndt* v. *Kloss* (Tex. Civ. App.) 263 S. W. 949; *Anderson* v. *Kelley*, 57 Okl. 109, 156 Pac. 1167; *Kee* v. *Armstrong, etc., Co.*, 75 Okl. 84, 182 Pac. 494, 5 A. L. R. 1349; *Manning* v. *Atlantic, etc., R. Co.*, 188 N. C. 648, 125 S. E. 555; *Torgerson* v. *Minneapolis, St. P., etc., Ry. Co.*, 49 N. D. 1096, 194 N. W. 741; *Oliveros* v. *Henderson*, 116 S. C. 77, 106 S. E. 855; *Churchill Township* v. *Cummings Tp.*, 51 Mich. 446, 16 N. W. 805.

[6] *Scott* v. *Wilson*, 185 Iowa 464, 170 N. W. 761.

justly draw from the facts alleged must be considered by the court in aid of the pleading.[7] But the demurrer does not admit the correctness of the conclusions of law stated by the pleader, or that the inferences of fact drawn by the pleader from facts alleged may be fairly and justly drawn therefrom.[8]

It is the function of the court to construe the contract made by the parties, not to make a contract for them, or to alter the contract they have made so as to conform it to the court's notion of the contract they should have made in view of the subject matter and the surrounding facts and circumstances.

The pole star for the construction of a contract is the intention of the contracting parties *as expressed by them in the words they have used.* The court may and should, as an aid to the interpretation of the words used, take into consideration the subject matter, the facts and circumstances surrounding the parties when they entered into the contract, and the purposes for which it was made. But it is not at liberty, because it has acquired a knowledge of those facts, to put a construction on the words the parties have used which they *do not properly bear.* It is the court's duty to declare what the *instrument itself* says it says.[9]

"The contract is to be construed as a whole, and

---

[7] *Webb* v. *Citizens' Nat. Bank,* 70 Ind. App. 22, 115 N. E. 799.

[8] Burks' Pl. & Pr. (2d Ed.) section 196 and note 63; Hogg's Eq. Pro. (Carlin's Ed.) section 317.

[9] *Richmond Engineering Corp.* v. *Loth,* 135 Va. 110, 115 S. E. 774, 783:

"It is true that it is commonly said that the court in the interpretation of contracts is endeavoring to find the intention of the parties. * * * In contracts of which no memorial is made and *no writing required by law,* it is doubtless true that where parties have made a bargain which both of them understand in a certain sense, their intent (which at least has been made plain to one another) must be sought, however inadequately expressed. But in contracts of the other class, this is not true, and although courts may say they are seeking the intention of the parties, the assertion is even more emphatic that this intention can be found only in the expressions of the parties in the writing. In effect, therefore, it is not the real intent, but the intent expressed or apparent in the writing which is sought." 2 Williston on Cont. section 610, pp. 1176-7.

effect given to every provision thereof if possible. No word or paragraph can be omitted in construing the contract if it can be retained and a sensible construction given to the contract as a whole."[10] No word or clause is to be treated as meaningless if any reasonable meaning consistent with the other parts of the contract can be given to it;[11] and no word or clause should be discarded unless the other words used are so specific and clear in contrary meaning as to convincingly show it to be a false demonstration.[12]

When two provisions of a contract seemingly conflict, if, without discarding either, they can be harmonized so as to effectuate the intention of the parties as expressed in the contract considered as a whole, this should be done.[13] The presumption always is that the parties have not used words aimlessly and that no provision is merely a superfluity unless it is plainly merely a repetition.

Words used by the parties are to be given their usual, ordinary and popular meaning, unless it can be clearly shown in some legitimate way that they were used in some other sense, and the burden of showing this is always upon the party alleging it.[14]

The contract is far from having the clarity that it is reasonable to expect to find in a contract dealing with so important a matter and so large an amount. Its intent is inadequately expressed in some particulars, and it contains provisions which, taken alone, are susceptible of constructions and interpretations that are contradictory of each other; but these provisions are, we think, susceptible of constructions which produce a harmonious whole without discarding any of its provisions or doing violence to any of its

[10] *Scott* v. *Albemarle Horse Show,* 128 Va. 517, 526, 104 S. E. 842; *Tate* v. *Tate's Ex'r,* 75 Va. 522, 527; *Mayo* v. *Phila. Tex. Co.,* 105 Va. 486, 488, 53 S. E. 967.
[11] *Smith* v. *Ramsey,* 116 Va. 530, 537, 82 S. E. 189, 15 A. L. R. 32; *Foster* v. *Wilson,* 139 Va. 82, 89, 123 S. E. 527; *Carnegie Nat. Gas Co.* v. *South Penn Oil Co.,* 56 W. Va. 402, 49 S. E. 548.
[12] *South Penn Oil Co.* v. *Knox,* 68 W. Va. 362, 367, 69 S. E. 1020.
[13] *Phoenix Ins. Co.* v. *Shulman,* 125 Va. 281, 286-7, 99 S. E. 602; *Stephenson* v. *Collins,* 57 W. Va. 351, 355, 50 S. E. 439.
[14] *Rosenberg* v. *Turner,* 124 Va. 769, 775, 98 S. E. 763.

language. Applying the rules of construction above stated, we are of opinion that the true meaning of the contract is this:

The First National Bank assigns, transfers and conveys to the American National Bank all its assets, real and personal, except its corporate franchise.[15] The American National assumes and agrees to pay all liabilities of the First National, other than its liability to its stockholders as such, regardless of whether the assets are sufficient for that purpose or not.

Within a reasonable time after the execution of the contract, the American National shall divide into two classes all the assets transferred to it. In the first class it shall put all assets which it deems collectible (*i. e.,* all assets to which the terms *collectible* or *uncollectible* are properly applicable that it deems worth their face value, such as money on hand and promises to pay fixed amounts which have matured or will mature within a reasonable length of time). Into the other class, designated as assets of doubtful value, it shall put promises to pay which it deems uncollectible or of doubtful collectibility and all assets which must be, or in the usual process of liquidating a business would be realized upon by a sale thereof, as distinguished from the collection thereof— for instance, real estate, tangible personal property, stocks and long term bonds. The making of this classification is left to the judgment of the American National Bank, but with the implied provision that it shall be made honestly and fairly in the light of the facts as they *then* shall be known or appear.

When such classification shall have been made, the First National shall execute its demand note payable to the American National Bank for an amount equal to the difference between the total amount of the liabilities of the First National assumed by it and the assets placed in the first class;

---

[15] The statutory double liability of the stockholders of a national bank is not an asset of the bank, and cannot be enforced, assigned, or transferred by it. See *post*.

and the amount so arrived at shall constitute the maximum of any liability that the First National shall be liable to the American National under this contract or by reason of its having assumed or paid off the First National's liabilities.

The assets placed in the first class shall become and be the absolute property of the American National. The assets placed in the second class shall be collateral or security for the payment of the liability evidenced by the note to be given.

The American National shall use all reasonable care and diligence to collect or otherwise realize upon the assets transferred to it. To protect the First National against abuse of the right of exchange hereinafter provided for, this provision shall extend to all assets, both those placed in class one and those placed in class two. The proceeds of the assets transferred to the American National shall be applied by it as follows: (1) The purchase price (*i: e.,* the face value) of the assets put in class one shall be at once applied to extinguish *pro tanto* any liability of the First National to the American National for assuming its liabilities. (2) The proceeds of all the other assets shall be applied when and as received to the payment of the liability of the First National to the American National which is to be evidenced by the above mentioned note, and to the payment of all expenses and attorney's fees and costs incurred by it in connection with the taking over, handling and liquidating these assets. (3) The balance, if any, it shall pay to the stockholders of the First National Bank in proportion to the stock held by them.

In order to protect the American National to some extent against mistakes in judgment in making the classification and the present outright purchase of assets hereby required, it shall have the right at any time during the process of liquidation to *exchange* any items or item placed in the first class *for* an equal amount (face value) of any item or items placed in the second class.

In the event the amount received by it from the liquida-

tion of the assets not placed in the first class shall be insufficient, when the liquidation thereof has been completed, to pay in full the cost and the amount for which it is provided the demand note shall be given, the American National shall have the right to resort to the statutory double liability of the stockholders of the First National to procure the payment of the balance thereof.

We do not concur in the views expressed by the chancellor that this is *simply* an agreement by the American National to liquidate the affairs of the First National for it, with an unlimited or general agreement by the First National to indemnify it for so doing; or that the provisions with reference to a classification of assets is an unessential and immaterial provision which the court may disregard; or that no method for carrying out this provision is made; or that the provision permitting the American National to *exchange* assets placed in the first class *for* assets placed in the second has the effect of nullifying the provisions with reference to the classification of assets and its corollaries.

The contract is a contract to assume and pay the debts of and liquidate the assets of the First National. But this is not all. There is superimposed upon it agreements, the effects of which are that the American National shall presently purchase outright at face value all those assets which, in a classification of assets fairly and honestly made, it shall classify as collectible, and that the maximum liability of the First National to indemnify the American National shall be limited to the difference between the total of the liabilities assumed and the assets so classified as collectible.

The first requisite for an asset "deemed collectible" is that it be an asset to which the term "collectible" is properly applicable. Money and promises to pay, matured or maturing in a reasonably short time, are properly spoken of as being *collectible* or *uncollectible*. Real estate, tangible personal property and stocks are not properly described as collectible assets. They must be sold to realize upon them. They cannot be collected. When the term "collectible assets"

is used in connection with the liquidation of the assets of a business, long term bonds which in the ordinary course of the liquidation of a business should be realized upon by sale, instead of waiting to collect them at maturity, are more properly classified as salable than as collectible. The American National is neither required nor authorized to fix the value at which assets placed in the first class shall be taken over by it. The value of such assets is left to be fixed automatically by their face value when they are classified as collectible. The assets to be placed in the first class are those deemed collectible (not partially collectible), that is, those worth their face value. As here used we think "assets it deems collectible" means money and promises to pay fixed amounts matured or maturing within a reasonable time which the American National deems worth their face value.

The chancellor seems to have fallen into the error of interpreting *exchange for* to mean *shift to*. An asset, or other thing, may be shifted from one class to another without taking anything from the class to which the shift is made, or putting anything into the class from which the shift is made. But this is not an *exchange* of an asset of one class *for* an asset or assets of the other class. There is nothing in this contract, or in the allegations as to the facts and circumstances surrounding its execution, which warrants the conclusion that the parties meant *shift to* when they chose and used the words *exchange for;* or that the parties intended to authorize the exchange of assets in one class for assets in the other without any regard whatever to the relative actual or face values of the assets exchanged. It would be a violent assumption that it was intended that the American National, a year after it had made the required classification, should have the right to exchange a $100 note placed in the first class for a $10,000 note placed in the second class which it had discovered would be paid in full in a few days. The words *"placed* in the first class" and *"placed* in the second class" as here used naturally and normally refer to assets placed therein in the original classi-

fication. It would, we think, be an unwarranted extension of the language used to hold that it authorized the American National, after having exchanged an item originally placed in the first class for one placed in the second, to exchange the item it had thus gotten from the second class for an item then in the second class, and to continue this process *ad infinitum*. The *exchange* authorized is impliedly limited to an exchange of an item for an item of like kind. For instance, the language used does not warrant the interpretation that it was intended to authorize an exchange of a note for real estate.

In our opinion the reasonable and fair interpretation of the provision with reference to exchange of assets is this: The American National may, at any time during the process of liquidation, *exchange* any unliquidated item, originally placed by it in the first class and still held by it, *for* a like amount, face value, of any item or items originally placed by it in the second class, which it would have been obligated to place in the first class had it deemed it collectible.

In view of the results attendant thereon and the use to be made thereof, it may be unusual to commit to one of the parties to such a contract the making of such a classification of assets, without any restraint upon its action other than the implied obligation to make it fairly and honestly in the light of the facts as they *then* shall be known or appear. But such a provision is neither impossible of performance nor illegal. When the words "those assets it deems collectible" and "exchange for" are interpreted as we have above interpreted them, there is no insuperable difficulty about giving effect to and enforcing the provisions with reference to classification of assets and the correlated provisions. In the event that the party charged with making the classification should fail or refuse to make the classification or act dishonestly in making it, the resulting complications and difficulties would be no greater than had the making of its classification been committed to a third party.

It is possible that, if the required classification had been made, the right of exchange provided for might have been so exercised by the American National that the ultimate liability of the First National to it, upon the completion of the liquidation of the assets, would be the same as it is if the required classification has not been made. But it cannot be said, as a matter of law, that this would be true.

The appellants contend that the making of the classification of assets was a condition precedent to the arising or existence of any liability upon the First National to the American National under this contract. This contention is too broad. The making of the classification was a condition precedent to the right of the American National to require the execution of the note provided for by the contract, and to the existence or exercise of any implied authority of any officer or officers of the First National to execute it. But it was not a condition precedent to the existence of any liability whatever by the First National to the American National, should the proceeds received from a liquidation of the assets prove insufficient to pay the liabilities assumed by it.

From the facts alleged with reference to the way in which the amount of the note was determined, the reasonable and fair inference is that no such classification of assets as is required by the contract had been made when the note was executed and delivered; and that both the American National and the officers of the First National who executed and delivered the note knew that it had not been made. It is alleged that the face value of the assets transferred by the First National exceeded the amount of its liability by approximately $500,000; that its liabilities, after deducting its cash on hand and money on deposit with other banks, amounted to approximately $2,202,000; and that on July 25, 1929, and numerous later occasions, after it had taken complete charge of the assets and had the opportunity to examine them, the American National advised its stockholders that the First National was solvent and after paying

its liabilities there would be a considerable surplus for its stockholders. It is hardly conceivable that this national bank with assets of a face value in excess of $2,700,000, which was being permitted by the Comptroller of the Currency and the Federal Reserve Board to continue to do a banking business, whose assets the American National Bank, after it had had an opportunity to examine them, considered worth considerably more than $2,202,000, did not have any negotiable notes which the American National was in duty bound, in a classification of assets then fairly and honestly made in the light of the facts as they then were known or appeared, to classify as collectible in full.

We are unable to concur in what seems to have been the opinion of the chancellor, that the contract as a matter of law authorized the execution and delivery of this note for approximately $2,202,000.

If the American National failed to make the required classification (and the bill alleges as a fact that it did fail to make it), no officer acquired authority by virtue of this contract to execute the note therein provided for; and the First National or its stockholders have the right to come into a court of chancery and have the note cancelled, unless it has become estopped to do so. It may be that there were facts and circumstances which work an estoppel, but the facts alleged in the bill do not.

However, upon a cancellation of the note the court should make the classification of assets which the American National obligated itself to make, basing its judgment upon the facts and circumstances as they were known or appeared on or about July 15, 1929. Having thus determined the assets which the American National was obligated to put in the first class and purchase outright, the court should proceed to settle the rights of the parties as if the classification made by it had been made in due time by the American National. The American National cannot complain of the substitution of the court's judgment as to what assets should have been classified by it as collectible, if it has

wrongfully failed or refused to exercise the discretion given it in the premises. It will not be permitted to gain an advantage from its wrongful failure to comply with the provisions of the contract, unless the First National has acquiesced in or is estopped from complaining of the failure. But on the other hand the failure of the American National to make the required classification of assets will not *ipso facto* relieve the First National from *all* liability to indemnify the American National.

It should be further noted in this connection that if the American National has failed to make the required classification and it has to be made by the court, the rights of the parties must be determined without reference to the right of exchange given in the contract, except to this extent: The American National may, when such classification has been made by the court, exchange any item or items placed by the court in the first class, which it still holds, for an equal amount (face value) of exchangeable items falling in the second class which have not been liquidated.

It is also *possible* that upon a proper accounting it will be found that, though the American National failed to make the classification and outright purchase of assets which it obligated itself to make, the true amount for which the First National is liable to indemnify the American National is the amount claimed by the American National. But the court cannot say from the allegations of this bill that this is true, and that, therefore, no injustice has been done these stockholders by the execution of this note.

We find nothing in this contract which expressly or impliedly authorizes the American National to sell to itself any of the assets transferred to it, other than those placed by it in the first class and purchased at their face value, or which authorizes any officer or officers of the First National to execute a note to the American National pledging the assets transferred to it as collateral security for the payment thereof with authority to purchase them from itself either at a public or at a private sale.

In their reply brief counsel for appellee say: "In the argument of the case before Judge Bain, the note itself, which is in the form of the collateral notes in general use by banks, was produced. It provided in part, as follows: [See footnote.][16] * * * Judge Bain, when he wrote his opinion, had seen this note, which had been produced in the argument, and in view of this circumstance his language in disposing of the matter [the sale of assets by the American National to itself] is thoroughly understandable and justified. He says: 'I do not consider the said sale invalid as a matter of law, and in neither paragraph is there any allegation of bad faith, or that the sale was not legally conducted, or that the sum bid was not a fair one and the best obtainable under the circumstances.' "

To this counsel for appellants reply: "The note is not a part of the record and therefore its provisions are not before this court. * * * This statement is a distinct surprise to counsel for complainants. At the argument on the demurrer, counsel for the American National Bank stated that he had the original of said note and a copy thereof in his possession, and moved that the complainants be required to file the copy as an exhibit with their bill. The motion was at once denied. Counsel for the American National then asked to be permitted to introduce the note as an exhibit on his own account. This request was also denied."

---

[16] "And the undersigned, for value received, hereby further agrees that upon the non-performance of this promise or upon the non-payment of any of the liabilities above mentioned, or upon the failure of the undersigned, forthwith, with or without notice, to furnish additional securities satisfactory to the holder, in case of a decline as aforesaid, then and in any such case this note and all other liabilities of the undersigned and any and all of them shall forthwith become due and payable without demand or notice, and full power and authority is hereby given to the holder of this note, to sell, assign and deliver the whole or any part of the above named property and securities, or any part thereof or of any substitutes therefor, or of any addition thereto, at public or private sale, or at any brokers board or exchange, at the option of the holder hereof, without demand, advertisement or notice of any kind, which are hereby expressly waived in respect to any and all such methods of sale; and at any such sale the holder hereof may purchase the whole or any part of the property sold free from any right of redemption on the part of the undersigned which is hereby expressly waived and released."

█ The position of the appellant is well taken. The case must be decided here without reference to these provisions of this note.

█ The bill alleges as a fact that on or about October 7, 1932, the American National sold to itself for $172,000 assets having a face value of $546,823.79 (including certain listed bonds and securities which had, on July 15, 1929, a quoted and actual market value of $285,000) ; and that it had no authority to sell these assets to itself. The allegation made in the last clause is more than a conclusion of law. It is an allegation of fact which is well pleaded, *unless* we can say as a matter of law that the contract authorized the American National to sell to itself these assets under the facts and circumstances alleged. We think this cannot be said.

█ Except where such authority has been conferred expressly, or by very plain implication, a bank cannot become the purchaser of a security pledged to it. If it does, though the bank may have acted in good faith and bid a fair price for the property, the sale is voidable at the election of the pledgor. 6 Michie on Banks and Banking, p. 193, section 17. In such a case the same principle applies which this court applied in *Williams* v. *Bolling,* 138 Va. 244, 255, 121 S. E. 270; *Bowles* v. *Bowles,* 141 Va. 35, 126 S. E. 49; *Smith* v. *Miller,* 98 Va. 535, 37 S. E. 10.

The law on this subject is well stated in *Glidden* v. *Mechanics' Nat. Bank,* 53 Ohio St. 588, 599, 600, 42 N. E. 995, 997, 43 L. R. A. 737, where it is said:

" * * * it is well settled, that in the absence of an express agreement to that effect, a pledgee cannot, directly or indirectly, become a purchaser at his own sale, for the satisfactory reason that he holds the property in a fiduciary capacity which forbids the disposition of it for his personal benefit, and requires good faith and fidelity to the interests of the pledgor in making a sale of it. His duty as a seller is inconsistent with his interest as a purchaser; and the principle that a trustee cannot be a purchaser at his own

sale is applicable. * * * And, it appears to be established by the great weight of authority that such a sale, when repudiated by the pledgor, is not a conversion, where no change has occurred in the actual condition and situation of the property. The relation of the parties remains the same as before the sale, the pledgee continuing to hold under the contract of pledge, leaving the title to the property and rights of the parties unaffected as though no sale had been attempted. Indeed, in such case, it is said there is no sale for want of a competent purchaser."

In commenting upon this case the annotator in 43 L. R. A. at p. 758, says: "The doctrine of the principal case on this subject seems to be general if not universal."

*Williams* v. *Bolling,* 138 Va. 244, 121 S. E. 270, was a case involving a sale of stocks made to himself by a stockbroker to whom they had been committed by a customer to be sold. In its opinion the court says at p. 255 of 138 Va., 121 S. E. 270, 273: "Nothing is better settled than that a man can not be the agent of both the seller and the buyer in the same transaction, without the intelligent consent of both. Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity and ability, is the main consideration in the selection of agents, and so careful is the law in guarding this fiduciary relation that it will not allow an agent to act for himself and principal, nor to act for two principals on opposite sides in the same transaction. All such transactions are voidable and may be repudiated by the principal, without showing that he was injured. In such cases the amount of consideration, the absence of undue advantage and other like features, are wholly immaterial. Nothing will defeat the principal's right of remedy except his own confirmation after full knowledge of all the facts. Actual injury is not the principal upon which the law holds such transactions voidable. The chief object of the principle is not to compel restitution, where actual fraud has been committed, or unjust advantage gained, but it is to prevent the agent from putting himself

in the position, in which to be honest is to be a strain upon him, and to elevate him 'to a position where he cannot be tempted to betray his principal.' "

We are of opinion that the bill states a case which, regardless of whether the American National acted in good faith and paid a fair price or not, entitles the stockholders of the First National Bank to have the sale made by the American National to itself set aside, and the assets it claims to have purchased at such sale treated as if the sale had never been attempted.

From what has been said, we are of opinion that none of the first five grounds of demurrer are good.

We come now to those phases of the case which involve the construction and/or the application of certain sections of Title 12, U. S. Code Ann. (the National Bank Act). The pertinent sections, in so far as they are applicable, are quoted in the footnote.[17]

---

[17] "Section 63. *Individual liability of shareholders.* The shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof in addition to the amount invested in such shares; * * *." (R. S. section 5151.)

"Section 64. *Individual liability of shareholders; transfer of shares.* The stockholders of every national banking association shall be held individually responsible for all contracts, debts, and engagements of such association, each to the amount of his stock therein, at the par value thereof in addition to the amount invested in such stock. * * *" (Dec. 23, 1913, c. 6, section 23, 38 Stat. 273.)

(Section 64 repeals by implication the above quoted provisions of section 63 in so far as the two are in conflict. See note of annotator, Title 12, section 63, U. S. C. A.)

"Section 65. *Enforcement of shareholders' individual liability by creditors on liquidation.* When any national banking association shall have gone into liquidation under the provisions of section 181 of this title, the individual liability of the shareholders provided for by section 63 of this title may be enforced by any creditor of such association, by bill in equity, in the nature of a creditor's bill, brought by such creditor on behalf of himself and of all other creditors of the association, against the shareholders thereof, * * *." (June 30, 1876, c. 156, section 2, 19 Stat. 63.)

Section 93 (R. S. section 5239) provides that if a national bank knowingly violates any provisions of the National Bank Act its franchise "shall be thereby forfeited;" but before it may be declared dissolved, the violation must be established in a suit brought by the comptroller in a district or Territorial court of the United States.

"Section 94. *Venue of suits.* Actions and proceedings against any

The 6th and 7th grounds of demurrer, which turn largely upon the nature of the statutory double liability of a stockholder of a national bank, cannot, we think, be sustained.

The statutory double liability imposed upon the stockholders of a national bank by sections 63-64 is in no sense a part of the corporate assets of the bank. It is not imposed for the benefit of the bank but for the sole benefit of its creditors; and in no case can the bank itself have resort to or enforce this liability. *Wehby* v. *Spurway, Receiver,* 30 Ariz. 274, 246 Pac. 759, writ of *certiorari* denied 273 U. S. 722, 71 L. Ed. 858, 47 S. Ct. 112; *Scott* v. *Latimer,* 89 Fed. 843, 33 C. C. A. 1, 14, affirmed in *Scott* v. *Deweese,* 181 U. S. 202, 45 L. Ed. 822, 21 S. Ct. 585; *Lantry* v. *Wallace,* 97 Fed. 865, 38 C. C. A. 510, affirmed 182 U. S. 536, 45 L. Ed. 1218, 21 S. Ct. 878. In this respect it is very different from the liability of a stockholder for his unpaid stock subscription, and from the assessment the bank is au-

association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established, or in any State, county or municipal court in the county or city in which said association is located, having jurisdiction in similar cases." (R. S. section 5198; Feb. 18, 1875, c. 80, section 1, 18 Stat. 320.)

"Section 181. *Voluntary dissolution.* Any association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock." (R. S. section 5220.)

"Section 191. *General grounds for appointment of receiver.* Whenever any national banking association shall be dissolved, and its rights, privileges, and franchises declared forfeited, as prescribed in section 94 [*sic.* 93], or whenever any creditor of any national banking association shall have obtained a judgment against it in any court of record, and made application, accompanied by a certificate from the clerk of the court stating that such judgment has been rendered and has remained unpaid for the space of thirty days, or whenever the comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, in either case, appoint a receiver who shall proceed to close up such association, and enforce the personal liability of the shareholders, as provided in section 192." (June 30, 1876, c. 156, sec. 1, 19 Stat. 63.)

"Section 192. *Default in payment of circulating notes.* On becoming satisfied, as specified in sections 131 and 132, that any association has refused to pay its circulating notes as therein mentioned, and is in default, the Comptroller of the Currency may forthwith appoint a receiver, and require of him such bond and security as he deems proper. Such receiver, under the direction of the comptroller shall take possession of the books, records and assets of every description

thorized by 12 U. S. C. A. section 55 to make upon its stockholders to make good an impairment of its capital. (See, in this connection, 13 Fletcher, Cyclo. Corp. [Perm. Ed.] sections 6047, 6264.) Where the bank goes into voluntary liquidation under 12 U. S. C. A. section 181, stockholders' statutory double liability can be enforced only by a general creditors' suit brought by a creditor or creditors for that purpose. Section 65. Where the bank. has been placed in the hands of a receiver by the Comptroller of the Currency in pursuance of sections 191-192, it can be enforced only by the receiver; and he can enforce it only after the comptroller has made an assessment upon the stockholders for the benefit of the creditors. All money collected by the receiver from a stockholder by virtue of his double liability is received and held by him as trustee for the creditors *and* the individual stockholder from whom it was collected. It is not in any sense held for the benefit of the corporation.

of such association, collect all debts, dues and claims belonging to it, and, upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and, on a like order, may sell all the real and personal property of such association, on such terms *as the court shall direct; and may, if necessary to pay the debts* of such association, enforce the individual liability of the stockholders. Such receiver shall pay over all money so made to the Treasurer of the United States, subject to the order of the comptroller, and also make report to the comptroller of all his acts and proceedings. * * *" (R. S. section 5234; May 15, 1916, c. 121, 39 Stat. 121.)

"Section 193. *Notice to present claims.* The comptroller shall, upon appointing a receiver, cause notice to be given by advertisement in such newspapers as he may direct, for three consecutive months, calling on all persons who may have claims against such association to present the same, and to make legal proof thereof." (R. S. section 5235.)

"Section 194. *Dividends on adjusted claims; distribution of assets.* From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the comptroller shall make a ratable dividend of the money so paid over to him by such receiver *on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction,* and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held." (R. S. section 5236.) (Italics ours.)

Section 197 (June 30, 1876, c. 156, section 3, 19 Stat. 63; Aug. 3, 1892, c. 360, 27 Stat. 345; Mar. 2, 1897, c. 354, 29 Stat. 600) provides

If he collects more than is necessary, after exhausting the assets of the bank, to pay the liabilities of the bank and costs of administration, he (or the winding up agent who succeeds him) must return the surplus to the stockholders from whom it was collected, having resort for that purpose to any assets of the bank which may remain unconsumed. Section 194 and section 197, Title 12 U. S. C. A.; *Richmond* v. *Irons,* 121 U. S. 27, 65, 30 L. Ed. 864, 7 S. Ct. 788; *Kennedy* v. *Gibson,* 8 Wall. 504, 19 L. Ed. 476; *Church* v. *Ayer* (D. C. Conn.) 80 Fed. 543; *Wehby* v. *Spurway, Receiver, supra.*

 It is a conditional liability imposed by law[18] as an incident of stock ownership; but the only sense in which it is conditional is that it can be enforced only when the assets of the corporation are not sufficient to pay its liabilities, and to the extent that they are insufficient. 7 Michie on Banks and Banking, section 73, p. 56; 13 Fletcher, Cyclo. Corp. (Perm. Ed.) section 6271.

that "when, as provided in section 194 thereof; the Comptroller of the Currency shall have paid to each and every creditor of such association, not including shareholders who are creditors of such association, whose claim or claims as such creditor shall have been proved or allowed as therein prescribed the full amount of such claims," and also all expenses, and provision has been made for redeeming its circulating notes, the comptroller shall call a meeting of the stockholders who shall determine whether the receiver shall be continued to wind up the affairs of the association or an agent shall be elected by them to do so. It then provides as follows:

"The proceeds of the assets or property of any such association which may be undistributed at the time of such meeting or may be subsequently received shall be distributed as follows:

"First. To pay the expenses of the execution of the trust to the date of such payment.

"Second. To repay any amount or amounts which have been paid in by any shareholder or shareholders of such association upon and by reason of any and all assessments made upon the stock of such association by the order of the Comptroller of the Currency in accordance with the provisions of the statutes of the United States; and

"Third. The balance ratably among such stockholders in proportion to the number of shares held and owned by each."

[18] In a qualified or limited sense it is contractual in that, by becoming an owner of stock, the stockholder impliedly agrees or consents to be bound by this obligation as an incident of his ownership of the stock owned by him. 7 Michie on Banks and Banking, section 73, p. 56; 13 Fletcher, Cyclo. Corp. (Perm. Ed.) section 6271; *Richmond* v. *Irons,* 121 U. S. 27, 30 L. Ed. 864, 7 S. Ct. 788.

■ As between themselves, the bank is primarily and its stockholders only secondarily liable for the payment of the bank's debts. (Section 197, Title 12 U. S. C. A.) But *quoad* the creditors of the bank the stockholders are primarily liable as principal debtors, and not as either sureties or guarantors,[19] though, as above noted, their liabilities are only conditional. Sections 63-65, Title 12 U. S. C. A.; *Hobart* v. *Johnson* (C. C.) 8 Fed. 493, opinion by Mr. Justice Blackford; *Graham* v. *Platt*, 28 Colo. 421, 65 Pac. 30. See, also, 13 Fletcher, Cyc. Corp. (Perm. Ed.) section 6268.

■ The complainants are asking here for the cancellation of a note which purports to be a note of the First National for the payment of which (if it be a valid obligation of the First National) they are each primarily bound as a principal debtor to an amount equal to the par value of his stock; and for the setting aside of an unauthorized sale made to itself by the American National of collateral held by it for the payment of a debt, for the balance due on which they are each primarily bound as a principal debtor to an amount equal to the par value of his stock, and for an accounting as to the balance due on that obligation. Where a person is primarily bound as a principal debtor on such an obligation to the extent that it is valid and subsisting, he has an interest which entitles him to bring a suit for such relief; and we are of opinion that it would be inequitable, in effect, to require him to pay what the creditor claims to be due, as a condition precedent to bringing his suit.[20]

Nor do we think that the 8th ground of demurrer is good.

[19] They are not released from liability by those acts of the bank which do not release it from liability, though they be acts which would have the effect of releasing a surety or guarantor. 13 Fletcher, Cyc. Corp. (Perm. Ed.) section 6269, p. 643.

[20] As will hereafter be seen, the pendency of this litigation does not operate to delay or prevent the receiver from proceeding to enforce the payment to him of the assessments made upon the stockholders by the comptroller. It only affects this question: Is the American National entitled to receive payment of the claim here in issue from money which has been or may be collected by the receiver from the stockholders but which still belongs to them except to the extent it may be required to pay valid subsisting debts of the First National Bank?

Unless the courts are ousted of jurisdiction to entertain this bill by the authority conferred upon the Comptroller of the Currency by the National Bank Act, under the facts alleged these appellants have a double right to bring this suit. They have a derivative right as stockholders to bring it on behalf of the First National Bank, because not only have the directors abandoned the management of the corporation, but both they and the receiver have refused to bring it, though requested so to do by the complaining stockholders. (*Liggett* v. *Roanoke Water Co.,* 126 Va. 22, 101 S. E. 55; *Virginia Pass. & Power Co.* v. *Fisher,* 104 Va. 121, 51 S. E. 198; 13 Fletcher, Cyc. Corp. [Perm. Ed.] section 5944 *et seq.,* and particularly sections 5963, 5966, 5970.) They are also entitled to bring it in their individual rights, because they are primarily bound as principal debtors upon the obligation in issue to the extent that it is a valid subsisting obligation.

The contention of the appellee is that upon the appointment of a receiver he became vested, to the exclusion both of the bank and of its stockholders with the power and authority to protect the rights of the bank and of its stockholders against improper claims by the bank's creditors and also to perform the very measurably conflicting and antagonistic duty of enforcing for the creditors of the bank the stockholders' statutory double liability to them. If this be true, neither the bank nor its stockholders may, as a matter of *right,* appeal even to the Comptroller of the Currency against the allowance and payment of a claim asserted against the bank and its stockholders which the receiver considers to be a proper claim or does not care to take the trouble to investigate. The receiver becomes, to all intents and purposes, judge, jury and executioner, from whose decision the *creditor* asserting the claim may appeal either to the comptroller or to the courts, or to both;[21] but to whose judg-

---

[21] See *post,* and *First Nat. Bank of Bethel* v. *Pahquioque Bank,* 14 Wall. (81 U. S.) 383, 20 L. Ed. 840, affirming *National Pahquioque Bank* v. *First Nat. Bank of Bethel,* 36 Conn. 325, 4 Am. Rep. 80;

ment (though it be based upon the most careless investigation or none at all) and to whose axe the bank and the stockholders must submit without the right to a judicial determination of their rights, or even the *right* of petition to an executive and administrative officer (the comptroller). Any petition they might file before the comptroller would have to be filed as a mere matter of grace and not of right. This is contrary to the genius of the common law and to that of government established by the Constitution of the United States; and no statute should be construed as so providing, unless it very plainly expressly so provides, or such a provision is a necessary and inescapable implication from its language.

Upon the refusal by the receiver to contest the validity or amount of a claim asserted against the bank and its stockholders, the stockholders may, *as a matter of right,* contest the validity or amount of the claim before the comptroller, and they may also bring a suit for that purpose in a court of competent jurisdiction, unless (as we think is not the case)[22] the comptroller has been given by the National Bank Act exclusive jurisdiction to exercise this judicial function to the exclusion of the judicial branch of the government.

The 9th ground of demurrer is that "the complainants have a complete and adequate remedy at law by setting up as grounds of defense to the common law actions brought by the receiver against the stockholders * * * the matters alleged in their bill of complaint." Though the chancellor relying upon the language used by the court in *Moss* v. *Whitzel* (C. C.) 108 Fed. 579,[23] expresses the opinion that this ground is well taken, we understand counsel for appellee to have abandoned it here, in effect admitting that it cannot

*Chemical Nat. Bank* v. *Hartford Deposit Co.,* 161 U. S. 1, 40 L. Ed. 595, 16 S. Ct. 439, affirming *Chemical Nat. Bank* v. *Hartford Deposit Co.,* 156 Ill. 522, 41 N. E. 225. See, also, *National Bank* v. *Insurance Co.,* 104 U. S. 54, particularly p. 74, 26 L. Ed. 693.

[22] See discussion of the 10th ground of demurrer, *post.*

[23] This case is criticized in *Thomas* v. *Hubbard* (D. C.), 4 Fed. Supp. 520.

be sustained. However that may be, we are of opinion that, under the decisions of the Supreme Court of the United States it is untenable.

As we understand the decisions of the Supreme Court of the United States on this subject, it holds: The National Bank Act has conferred upon the Comptroller of the Currency the authority to determine "upon such data as shall be satisfactory to him,"[24] without notice to any one (other than the notice required to be given creditors by 12 U. S. C. A. section 193) when it is necessary to enforce the statutory double liability of the stockholders of a bank, which he has declared insolvent and for which he has appointed a receiver, and whether an assessment shall be made for the whole or only a part of it. Both the making of the assessment and the enforcement of the payment thereof by bringing actions thereon are administrative functions,[25] for the exercise of which neither an actual insufficiency of the bank's assets to pay its liabilities, nor a judicial determination that its assets are insufficient for that purpose, is a jurisdictional prerequisite. Neither the validity of nor the necessity for an assessment made by the comptroller nor the necessity for or propriety of enforcing it can be inquired into by a court in any collateral proceeding. It can be avoided by a court only in a direct attack thereon, and then only for error of law,[26] fraud, or mistake.[27] Any defense as to the necessity for or amount of an assessment

[24] *Kennedy* v. *Gibson*, 8 Wall. (75 U. S.) 498, 505, 19 L. Ed. 476.

[25] Some of the cases say that the making of an assessment by the comptroller is a judicial or quasi judicial function which may be, and is, committed to the comptroller, without violating the constitutional provisions relating to a separation of the powers of the government. But in whatever verbal cloak it be clothed, a determination which is to be made by an administrative officer, without any notice whatever to those who are to be affected thereby or opportunity to them to be heard, and "upon such data as shall be satisfactory to him," is in no proper sense a judicial determination, it is merely an administrative determination.

[26] *United States* v. *Knox*, 102 U. S. 422, 26 L. Ed. 216.

[27] *Deweese* v. *Smith*, 106 Fed. 438, 45 C. C. A. 408, 66 L. R. A. 971, affirmed in *Smith* v. *Brown*, 187 U. S. 637, 47 L. Ed. 344, 23 S. Ct. 845.

made by the comptroller or as to the necessity for or propriety of enforcing it, which is set up in a proceeding brought by the receiver to enforce the payment of it, is a collateral attack thereon. In such a proceeding a stockholder cannot defend the payment, in whole or in part, of the assessment on the ground that there is no necessity for a resort to the stockholders' statutory liability either because the bank owes no debts, or the bank's assets are sufficient to pay all its liabilities, or because some of the claims asserted against it are illegal or for larger amounts than are owing. He cannot in such a proceeding contest the validity or amount of any claim being asserted against the bank and its stockholders under their statutory double liability, or have an accounting of the indebtedness of the bank. *Kennedy* v. *Gibson,* 8 Wall. 498, 19 L. Ed. 476; *Casey* v. *Galli,* 94 U. S. 673, 24 L. Ed. 168; *Richmond* v. *Irons,* 121 U. S. 27, 30 L. Ed. 864, 7 S. Ct. 788; *Bushnell* v. *Leland,* 164 U. S. 684, 41 L. Ed. 598, 17 S. Ct. 209; *Deweese* v. *Smith,* 106 Fed. 438, 45 C. C. A. 408, 66 L. R. A. 971, affirmed in *Smith* v. *Brown,* 187 U. S. 637, 47 L. Ed. 344, 23 S. Ct. 845; *Liberty National Bank* v. *McIntosh* (C. C. A., 4 Cir.) 16 Fed. (2d) 906, *certiorari* denied 273 U. S. 769, 783, 71 L. Ed. 890, 47 S. Ct. 571. See, also, *Wannamaker* v. *Edisto Nat. Bank* (C. C. A., 4 Cir.) 62 Fed. (2d) 696; and cases cited from other Federal and State jurisdictions in note 41 to section 64, Title 12 U. S. C. A.

The rationale of this rule is nowhere better expressed than in *Kennedy* v. *Gibson, supra,* in which the court says:

"It would be attended with injurious consequences to forbid actions against the stockholders until the precise amounts necessary to be collected shall be formally ascertained. This would greatly protract the final settlement, and might be attended with large losses by insolvency and otherwise in the intervening time. The amount must depend in part upon the solvency of the debtors and the validity of the claims. Time will be consumed in the application of these tests, and the results in many cases cannot be fore-

seen. The same remarks apply to the enforced collections from the stockholders. A speedy adjustment is necessary to the efficiency and utility of the law; the interest of the creditors require it, and it was the obvious policy and purpose of Congress to give it. If too much be collected, it is provided by the statute, that any surplus which may remain after satisfying all demands against the association, shall be paid over to the stockholders. It is better that they should pay more than may prove to be needed than that the evils of delay should be encountered."

This does not violate the fundamental principle that a man ought not to be deprived of his property except by due process of law, *provided* the stockholders thereafter be afforded the opportunity to contest the validity and amount of the claims which are being asserted against the bank (*i. e.* against them), and provision be made for the return of that part of the money collected from them, which is not required to pay valid subsisting claims against them, to those from whom it was collected. The situation is much the same as where a person's property is taken under the right of eminent domain without giving him the right to be heard as to its value before it is taken, but with the right thereafter to prove and enforce in a judicial proceeding the payment to him of its fair value.

The 10th ground of demurrer is the one upon which the appellee relies most insistently. We have heretofore stated it in the language of the appellee, and upon comparison it will be seen that its statement of it follows very closely this language from the opinion in *Liberty National Bank* v. *McIntosh* (C. C. A., 4 Cir.) 16 Fed. (2d) 906, 909, which the appellee quotes in his brief:

"The decisions of the Comptroller of the Currency are not subject to collateral attack, nor is his assessment against shareholders, and the amount thereof open to review; but, on the contrary, neither the bank nor the shareholders, clearly in the absence of fraud charged and proved, are entitled to a judicial determination of any question involved

in his decision either as to the solvency, *the sum due creditors* and the amount of assessments as ordered, such matters one and all being exclusively within the judgment and discretion of the comptroller, and as to which he acts in a quasi judicial capacity." (Italics ours.) [28]

Upon a careful analysis it will be found that the language above quoted is in several respects (which need not be noticed here) not a model for accuracy. It is broad enough to give color to a contention that the court meant to say that, where the comptroller declares a bank insolvent and appoints a receiver for it, the courts are thereby ousted from all jurisdiction to entertain a suit brought for the purpose of determining the validity of a debt or the sum due on a debt which is asserted against the bank; and that the decision by the comptroller as to the validity or amount of a claim against the bank and its stockholders is exclusive and cannot be reviewed by a court, except for fraud. But what is there said is to be interpreted in the light of the facts and issues presented in that case. When it is so interpreted, we do not understand the court to have meant to say this. If it did, its utterance is to this extent dictum,[29] and is not

[28] Following the above quoted paragraph the court cites: "*Kennedy* v. *Gibson*, 8 Wall. (75 U. S.) 498, 19 L. Ed. 476; *Casey* v. *Galli*, 94 U. S. 673, 24 L. Ed. 168; *United States* v. *Knox*, 12 Otto (102 U. S.) 422, 26 L. Ed. 216; *Richmond* v. *Irons*, 121 U. S. 27, 7 S. Ct. 788, 30 L. Ed. 864; *Schrader* v. *Bank*, 133 U. S. 67, 10 S. Ct. 238, 33 L. Ed. 564; *Bushnell* v. *Leland*, 164 U. S. 684, 17 S. Ct. 209, 41 L. Ed. 598; *Hightower* v. *Bank*, 263 U. S. 351, 44 S. Ct. 123, 68 L. Ed. 334; *Deweese* v. *Smith* (8th C. C. A.) 106 Fed. 438, 66 L. R. A. 971."

[29] *Liberty Nat. Bank* v. *McIntosh* was a suit brought by the Liberty National Bank (and apparently its stockholders or some of them) against the comptroller and the receiver appointed by him for it. No creditor, or party asserting a claim against the bank was a party to it. The bill prayed that the actions of the comptroller in declaring the bank insolvent, appointing a receiver for it, and making an assessment for $250,000 against its stockholders be decreed to be void, and the comptroller and the receiver enjoined from attempting to enforce the assessment made. The Liberty National had made a contract with the Exchange National Bank to liquidate and wind up its affairs, which is similar in many respects to the contract here in issue, and its liabilities consisted of the amount (if anything) owed by it to the Exchange National and some $6,000 owed to other parties. The comptroller had determined that the amount owed to the Exchange National was $453,008.10, and made an assessment for

supported by the cases cited. Certainly the court has not in any of the cases cited in *Liberty Nat. Bank* v. *McIntosh,* or in any other case to which our attention has been called, authoritatively so decided; and we are of opinion that the National Bank Act (12 U. S. C. A. section 194) is not properly construed as so providing.

The cases cited by the court in *Liberty National Bank* v. *McIntosh* (as well as a number of others to which we are cited by the appellee) [30] are authority for these propositions: (1) Neither the bank nor a stockholder may question the validity of the action of the comptroller in declaring it insolvent, appointing a receiver for it, and in making and proceeding to enforce by actions brought by the receiver an assessment against the stockholders, except in a direct proceeding brought for the purpose, and then only for error of law, fraud or mistake. (2) A judicial determination of the debts of the bank is not a jurisdictional prerequisite to the validity of an assessment made by the comptroller, or to his right to enforce it by actions brought by the receiver against the stockholders. (3) In an action or other proceeding, brought by the receiver against a stockholder to en-

---

$250,000 against the stockholders. The principal ground on which the complainants asked the relief prayed was that the Liberty National had, in effect, gone into voluntary liquidation, and therefore the comptroller had no power or authority to declare it insolvent, appoint a receiver for it, and make an assessment against its stockholders, and that proceedings to this end could only be had in a court of chancery in accordance with section 65. They also seem to have contended that they were entitled to this relief because the Exchange National had not lived up to its contract and was not entitled to recover anything against the Liberty National or its stockholders. This was in effect a contention that a judicial determination that the liabilities of the bank required an assessment was a jurisdictional prerequisite to the making of an assessment by the comptroller. As the creditor whose claim was under attack was not a party to the suit, manifestly the suit could not be taken to be, even in part, a suit to require an accounting by the creditor to determine the amount owed it.

[30] *Crawford* v. *Gamble* (C. C. A., 6 Cir.) 57 Fed. (2d) 15; *Collins* v. *Caldwell* (C. C. A., 5 Cir.) 29 Fed. (2d) 329; *Wannamaker* v. *Edisto Nat. Bank* (C. C. A., 4 Cir.) 62 Fed. (2d) 696; *Thomas* v. *Hubbard* (D. C.) 4 Fed. Supp. 520, which criticizes *Moss* v. *Whitzel* (C. C.) 108 Fed. 579; *Miller* v. *Stock* (C. C. A., 3 Cir.) 65 Fed. (2d) 773, 90 A. L. R. 1061; *Schram* v. *Schwartz* (C. C. A., 2 Cir.) 68 Fed. (2d) 699.

force the payment of an assessment made by the comptroller, the stockholder cannot defend by showing that the bank owes no debts, or that the amount of its debts is less than its assets, or in any way contest the validity and/or amount of any claim being asserted against the bank. But none of these cases involved the question, whether or not, after the comptroller has declared a bank insolvent and appointed a receiver for it, a court of chancery has jurisdiction to entertain a suit brought by a creditor to establish his claim against the bank, or whether under such circumstances a court has jurisdiction to entertain a suit brought by the bank or its stockholders to contest the validity, in whole or in part, of a claim being asserted against the bank.

*Kennedy* v. *Gibson* (1869) 8 Wall. (75 U. S.) 498, 505, 19 L. Ed. 476 (the leading case to which the others hark back) was a bill filed by the receiver appointed for Merchants' National Bank against some of the stockholders of that bank to have the court take an account "as against the stockholders" of the liabilities and assets of the bank, and make and enforce an assessment against them under their statutory double liability to pay the debts of the bank. The court sustained the demurrer to the bill, because it was not alleged that the comptroller had determined that an assessment against the stockholders was necessary and the amount thereof. On this point the court, speaking through Mr. Justice Swayne, said:

"The receiver is the instrument of the comptroller. He is appointed by the comptroller, and the power of appointment carries with it the power of removal. It is for the comptroller to decide when it is necessary to institute proceedings against the stockholders to enforce their personal liability, and whether the whole or a part, and if only a part, how much, shall be collected. These questions are referred to his judgment and discretion, and his determination is conclusive.[31] The stockholders cannot controvert it. It is

[31] Three later cases in which the opinions were written by Mr. Justice Swayne show that the word picture here painted in with a broad brush requires some modification: *National Bank of the Com-*

not to be questioned in the litigation that may ensue. He may make it at such time as he may deem proper, and upon such data as shall be satisfactory to him. This action on his part is indispensable, whenever the personal liability of the stockholders is sought to be enforced, and must precede the institution of suit by the receiver. The fact must be distinctly averred in all such cases, and if put in issue must be proved."

\* \* \* \* \* \* \* \*

"The claims of creditors may be proved before the comptroller, or established by suit against the association. Creditors must seek their remedy through the comptroller in the mode prescribed by the statute; they cannot proceed directly in their own names against the stockholders or debtors of the bank. The receiver is the statutory assignee of the association, and is the proper party to institute all suits; they may be brought both at law and in equity, in his name, or in the name of the association for his use. He represents both the creditors and the association, and when he sues in his own name it is not necessary to make either a party to the suit."

In the course of the opinion Mr. Justice Swayne calls attention to the provision of the statute (12 U. S. C. A. section 194) that the comptroller, after providing for the redemption of its circulating notes, shall distribute all moneys received by him from the assets of the bank and the collection of assessments against the stockholders ratably "on all claims which have been proved to his satisfaction, or adjudicated in a court of competent jurisdiction," and pay the surplus, if any, to the stockholders. But the case called for no comment (and none is made) as to what extent, if at all, the determination of the validity of and amount of claims asserted against the bank and its stockholders is committed, or attempted to be committed, exclusively to the determination of the comptroller.

monwealth v. *Mechanics' Nat. Bank* (1876), 94 U. S. 437, 24 L. Ed. 176; *Casey* v. *Galli* (1876), 94 U. S. 673, 24 L. Ed. 168; and *United States* v. *Knox* (1880), 102 U. S. 422, 26 L. Ed. 216.

Soon after the decision in *Kennedy* v. *Gibson,* the court in *First National Bank of Bethel* v. *Pahquioque Bank* (1871) 14 Wall. (81 U. S.) 383, 397, 20 L. Ed. 840,[32] held that, where a claim is presented to the comptroller and disallowed by him, the creditor may bring a suit against the bank, in a State or Federal court of competent jurisdiction, to establish his claim; and that if the court adjudge it to be valid, the comptroller must include it in the claims on which he is required to make a ratable dividend. That is, it held that the National Bank Act does *not* give to the comptroller authority to determine *to the exclusion of the courts* whether a claim asserted against the bank is a valid claim, or the amount thereof.

The facts in this case were these: The First National Bank of Bethel failed to redeem some of its circulating notes, whereupon the comptroller appointed a receiver for it, who entered upon the discharge of his duties. The Pahquioque Bank presented its claim against the First National Bank of Bethel to the reciver and the comptroller, who refused to allow a part of the amount claimed. It then brought its action of assumpsit in the State court against the First National Bank of Bethel for the full amount claimed by it. The receiver was not made a party to the action; but by direction of the comptroller he appeared and defended the action in the name of the defendant bank for the benefit of the stockholders and creditors. The trial court certified the case to the Supreme Court of Connecticut for its advice as to whether the "case ought to be dismissed for want of jurisdiction and, if not, what judgment ought to be rendered" in it. That court held that the court had jurisdiction, and advised judgment for the plaintiff for the full amount claimed by it. In its opinion in 36 Conn., at pp. 337-8, the court says:

"It has ever been the policy of the people of this country to afford to every man full and ample opportunity for the

---

[32] Affirming *National Pahquioque Bank* v. *First Nat. Bank of Bethel,* 36 Conn. 325, 4 Am. Rep. 80.

determination and enforcement of all his personal rights, and rights of action and of property. This policy is recognized in every State Constitution, and in the seventh amendment of the Constitution of the United States. Important rights are never, except in cases of special necessity, submitted to the conclusive decision of one man, or of a board of men, without a right of appeal to some judicial tribunal, or other opportunity to review the decision. It would therefore have been extraordinary, indeed, if in framing and adopting so important a measure, the power of conclusively determining the rights of creditors against insolvent associations, whatever their intricacy or amount, should have been given to a single officer of the government, who, under our system, is quite as likely to be a mere politician as a jurist, without any remedy against interest, relationship, bias or caprice. On looking to the act we find, as might have been expected, that such power is not given to the comptroller, as has been claimed in the argument. He is authorized to give notice to all persons to present their claims and to make legal proof thereof, but *he is not authorized to determine their validity, so as to conclusively bind the parties.* (Italics ours.) On the contrary, the common-law right of every man to have his claim investigated and determined in a court of justice, is recognized and provided for. The comptroller is to pay a dividend on all such claims as may have been proved to his satisfaction, or '*adjudicated in a court of competent jurisdiction,*' and also to make further dividend as aforesaid, on all claims 'previously proved or *adjudicated.*' It is perfectly apparent from these provisions, and from the absence of express authority to the comptroller to make a conclusive decision, that it was the intention of Congress to leave the right of the creditor to a judicial determination of the validity of his claim, at his election, or upon disallowance, in full force and unimpaired."

Not only was the decision of the Connecticut court affirmed in 14 Wall. (81 U. S.) 383, 20 L. Ed. 840, but in *Chemical National Bank* v. *Hartford Deposit Co.,* 161 U. S.

1, 16 S. Ct. 439, 40 L. Ed. 595, Mr. Chief Justice Fuller speaking for the court cites it, with approval, follows its doctrine, and characterizes it as "a well considered opinion."

The First National Bank of Bethel carried this case to the Supreme Court of the United States, contending among other things: (a) That it could not be sued because it had been dissolved by the action of the comptroller; (b) that it could not be sued because it was under the control and in possession of a receiver appointed by the comptroller; and (c) that the decision of the receiver disallowing the claim of the plaintiff was final and not subject to review in the State court. That court held that none of these contentions was well made and affirmed the judgment of the State court. Speaking through Mr. Justice Clifford the court said in part:

"Whenever a receiver is appointed the comptroller is required to give notice of the fact, requesting all persons having claims against the association to present the same and to make legal proof thereof. Provision is first to be made by the comptroller for refunding * * * the notes of the association, * * * and * * * the comptroller is required in the next place to make a ratable dividend of the money paid over to him by the receiver on all such claims as may have been proved to his satisfaction *or adjudicated in a court of competent jurisdiction.* Claims proved to the satisfaction of the comptroller are to be included in the list, and he is also to include in the list all claims adjudicated in a court of competent jurisdiction, which shows conclusively that claims disallowed by the comptroller may be prosecuted in a court having jurisdiction of such cases. * * *

"None of these proceedings, however, support the theory that the association ceased to exist when the receiver was appointed, nor at any time before the assets of the association are fully administered and the balance, if any, is paid to the owners of the stock or their legal representatives."
* * * The provisions that before the comptroller may declare the franchise of the bank forfeited and the corporation

dissolved, a violation of the act must be adjudged by the proper circuit, district, or territorial court of the United States "shows conclusively that the act of the comptroller in appointing a receiver does not work a complete dissolution of the association, as is supposed by the defendants.

\* \* \* \* \* \* \* \*

"\* \* \* we are all of the opinion that the act contains nothing in its subsequent provisions inconsistent with the theory of the plaintiffs, that the association may sue and be sued, complain and defend, in all cases where it may be necessary that the corporate name of the association shall be used for that purpose in closing its business and winding up its affairs under the provisions of the act which authorized its formation.

\* \* \* \* \* \* \* \*

"Attempt is made to show that the adjudicated claims there referred to are only such as had been adjudicated before the receiver was appointed, but the court is of the opinion that such a construction is not warranted either by the language employed, or the subject matter to which it relates, or the purpose to be accomplished, or by the analogies of the law or the usual rules of interpretation which courts apply in ascertaining the meaning of a legislative provision of a remedial character. Tested by any one or all of these criterions the court is of the opinion that the construction assumed by the defendants is quite too narrow to carry into effect the intention which the framers of the provision had in view at the time it was adopted. Claims presented by creditors may be proved before the receiver, or they may be put in suit in any court of competent jurisdiction, as a means of establishing their validity and to determine the amount owed by the association, but the judgment when recovered will not give the creditor any lien on the property of the delinquent association, nor secure to the judgment creditor any preference over other creditors whose claims are proven before the receiver. All alike must await the action of the Comptroller of the Currency, and be

content with a just and legal distribution of the proceeds of the assets collected by the receiver and liquidated by the comptroller according to the act of Congress in such case made and provided."

In his argument counsel for the Pahquioque Bank made the point that, no provision is made for the comptroller to give the interested parties a judicial hearing on, or even to make a thorough investigation of the merits or demerits of a claim asserted against the bank and its stockholders, if he would; for he is not empowered to summon witnesses and compel them to attend and testify under oath. We have not been cited to and have not found any statute giving the comptroller, or any agent of his, any authority to summon witnesses and compel them to testify in any investigation he may undertake to make, or which requires him to give either the bank or its stockholders (or even the receiver) any notice or opportunity to be heard in opposition to the allowance of any claim presented to him. Any investigation he can or does make must be made and his decision reached on such information as he may be able to get without being able to compel witnesses to testify.

The court made no comment on these points, but they tend strongly to support the view which we entertain, which is, that Congress did not intend (if it has the power to do so) to make the decision of the comptroller as to the validity or amount of a claim asserted against the bank controlling, except until and unless there be a judicial determination of the question.

The appellee relies with some confidence on a statement made in the opinion in *National Bank of the Commonwealth* v. *Mechanics' Nat. Bank,* 94 U. S. 437, 441, 24 L. Ed. 176. In this case the comptroller allowed a claim of the Mechanics' Bank and others against the National Bank of the Commonwealth, and by the application of several dividends declared by him paid the principal amounts of the several debts, but refused to pay any interest thereon. These creditors then brought their suit against the National Bank of

the Commonwealth for the interest they claimed to be due them. The court gave judgment for the complainants. Upon appeal the Supreme Court affirmed the judgment, holding: "The treasury authority fell into error. There should have been no discrimination between principal and interest in making the payments. The creditor had the same right with respect to both as if he had been pursuing the defaulting debtor under other circumstances. The comptroller should have done just what the law would have done if the case had not come under his cognizance."

In the course of the opinion, written by Mr. Justice Swayne, this language is used: "We have shown that the claims, when proved to the satisfaction of the comptroller, *were upon the same footing as if they had been in judgment.* (Italics ours.) The amount in arrear was liquidated, and as certain as if it consisted wholly of principal instead of interest. The action was, therefore, well brought." The appellee places much emphasis on the italicized words; but the actual decision of the court shows that he could not have meant that the decision of the comptroller had the effect of rendering the matter *res adjudicata* as would the judgment of a court, for the court let it stand upon the same footing as a judgment only until a judgment of a court was rendered in the premises.

In *Chemical Nat. Bank* v. *Hartford Deposit Co.*, 161 U. S. 1, 40 L. Ed. 595, 16 S. Ct. 439 (affirming 156 Ill. 522, 41 N. E. 225), in an opinion written by Mr. Chief Justice Fuller, the court approved and followed its decision and opinion in *First National Bank of Bethel* v. *Pahquioque Bank, supra;* and affirms the holding of the Supreme Court of Illinois that the receiver was not a necessary party to an action brought by a creditor against the bank to establish his claim after it has been disallowed by the comptroller.

The reasoning of the cases above referred to is sound, and we think is applicable to a case in which the bank and/or its stockholders contest the validity or amount of a claim asserted against the bank which has been allowed by the

comptroller, as well as to a case in which the person asserting a claim against it is dissatisfied with the action of the comptroller in disallowing it in whole or in part. It would indeed be an anomaly to interpret the statute as providing (or attempting to provide) that the debtor, who had had no notice or opportunity to be heard, shall be irrevocably bound by the decision of the comptroller, if it be adverse to him, but that the creditor who has been heard is not bound by the decision if it be adverse to him. A statute should not be given an interpretation which gives it that effect, unless it expressly so provides in very plain terms, or by necessary and inescapable implication.

So far as they are here material, the provisions of the Georgia banking law are very similar to those of the National Bank Act. In *Martin* v. *Bennett* (D. C.) 291 Fed. 626, 629, the court had the Georgia act under consideration. If the words *superintendent of banks* be stricken out and *Comptroller of the Currency* be inserted in lieu thereof, this quotation from the opinion of the court in that case expresses our view with reference to the interpretation of the National Bank Act:

"There is no provision of law which provides that the stockholder may not by a proper legal proceeding secure a judicial ascertainment of the amount which the bank may owe, if for any sufficient reason he thinks that amounts not in fact owed by the bank are being allowed as debts by the superintendent of banks, but only that he may not interrupt, or prevent, the payment of the fund due from him as a stockholder into the hands of the superintendent of banks by reason of any attack upon that officer's estimate of debts or assets and of the amount of assessment deemed by him to be necessary, so as to delay the payment of such assessment."

In so far as the allowance or disallowance of a claim by the comptroller affects the distribution of the assets of the bank and/or the funds collected by the receiver from an assessment made upon the stockholders, it is an adminis-

trative determination of the matter, which is controlling until and unless (but only until and unless), the matter is determined by a court of competent jurisdiction. The bank and/or the stockholders may, in a proper case, bring a suit for the purpose of contesting the validity of a claim being asserted by an alleged creditor, either before or after it has been presented to the comptroller and allowed by him; but such relief cannot be had in a proceeding which also seeks to enjoin, restrain or interfere with the collection by the receiver of an assessment made by the comptroller.

The appellee relies with so much insistence upon the case of *Wannamaker* v. *Edisto Nat. Bank* (C. C. A.) 62 Fed. (2d) 696, that we feel that it should not be passed over without further notice of it. That case involved a liquidating contract and a note similar in some respects to the contract and note here in issue; but neither the contract nor the note had been ratified by the stockholders of the Orangeburg National Bank in meeting assembled. However, with the knowledge of the stockholders of the Orangeburg National, the Edisto National had proceeded to operate under the contract for some five years. When liquidation of the assets was completed, it developed that a large balance was due the Edisto National on this note. In order to pay this debt, the comptroller appointed a receiver for the Orangeburg National and made an assessment against its stockholders, for the collection of which the receiver instituted actions against the stockholders. Instead of instituting a suit against the Edisto National for the sole purpose of having the validity of the claim asserted judicially determined, Wannamaker and several other stockholders (suing for themselves and all other stockholders) instituted this suit against the Edisto National Bank and the receiver appointed for the Orangeburg National. The bill appears to have prayed that the court decree that the Orangeburg National was not insolvent; that there was no debt in existence rendering the assessment made by the comptroller necessary, and that the receiver be enjoined from collecting the assess-

ment from the stockholders, and the Edisto National enjoined from accepting from the comptroller the payment to it. of any sums collected from them. It further prayed, as an incident of the granting of that relief, that the contract entered into between the two banks and the note given in pursuance thereof be cancelled and the claim asserted by the Edisto National be declared invalid. The court very properly held that in so far as the bill was a bill to enjoin the receiver from collecting the assessments made by the comptroller, or to interfere with his collection thereof, it was demurrable. It might well have gone further and held the bill as a whole subject to demurrer on the ground that this was its primary purpose, and the relief asked against the Edisto National was purely incidental to this main purpose of the bill. But neither the District Court[33] nor the Circuit Court of Appeals seems to have been willing to rest its decision overruling the demurrer to the bill as a whole on that ground. After denying the right of the complainants to enjoin the receiver, regardless of the validity or invalidity of the alleged debt, they both proceeded to examine the merits of the bill regarded as a bill by the stockholders of the Orangeburg National against the Edisto National for the sole purpose of contesting the validity of the claim asserted by it; and decided that regardless of the fact that a receiver had been appointed for the bank, the bill does not state a case which shows that the complainants are entitled to the relief prayed against the Edisto National. They further held that the bill showed on its face that if the complainants were ever entitled to the relief prayed against the Edisto National they were then barred by laches. That is, they both proceeded to adjudicate upon the right of the Edisto National to recover against the Orangeburg National as if no decision or action of the comptroller was in any way involved in it.

---

[33] The memorandum opinion of the District Court (Judge Cochran) has not been published; but a copy thereof was procured by appellee and appended to his brief.

The instant case differs from *Wannamaker* v. *Edisto Nat. Bank* in several particulars, among other things, it is not a suit to have the assessment made by the comptroller declared void, or to restrain or in any way interfere with the collection of the assessments made by him. Its purpose is to have a judicial determination of what, if anything, is due by the First National to the American National against the time that the comptroller shall come to disburse the money collected from the stockholders on the assessments made against them.

There is one other point to be noticed. (See grounds of demurrer 11 and 12.) Among other things, the bill prays that the American National be "enjoined from appropriating to its own use any sum or sums which may be collected from any of your complainants and paid over to it by the receiver of the First National Bank, or by the Comptroller of the Currency, but will direct that such sum or sums be held in trust by said bank for the benefit of your complainants and the other stockholders of the First National Bank who may come into and be made parties to this suit; (and) that it will in any event enjoin the said American National Bank from disposing of any such sum or sums until such accountancy can be had and until the further order of the court." In so far as the prayer for an injunction is concerned, we are of opinion that there is no allegation which warrants injunctive relief. Further, the statutory liability of the stockholders is several and not joint; and whatever surplus there may be of the money collected from stockholders on their assessment does not belong to the corporation or to the stockholders as a general class, but to those whose payments have created the surplus. Until a stockholder has paid his assessment, he is not entitled to have the court decree that the sum, or any part thereof, received by the American National be held by it in trust for his benefit. Only those who have paid their assessments can have any community of interest in any sum which may be collected by the receiver on assessments against stock-

holders, whether it remains in his hands or be paid by him or the comptroller to the American National.

The decree of the court will be reversed, the amended bill filed, and the cause remanded for further proceedings (not in conflict with the views herein expressed) to be had on the amended bill.

*Reversed and remanded.*